1   KEVIN C. LOMBARDI (DC BAR NO. 474114) (lombardik@sec.gov)
    IAN R. DATTNER (NY BAR NO. 4411187) (dattneri@sec.gov)
2   LISA WEINSTEIN DEITCH (CA BAR NO. 137492) (deitchl@sec.gov)

3   Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
4   100 F Street, NE
    Washington, DC 20549
5   Telephone:  (202) 551-8753 (Lombardi)
    Facsimile:  (202) 772-9291 (Lombardi)

6

7

8                       **UNITED STATES DISTRICT COURT**

9                     **NORTHERN DISTRICT OF CALIFORNIA**

10                            **SAN JOSE DIVISION**

11

12   SECURITIES AND EXCHANGE COMMISSION,

              Plaintiff,

13                                                        **COMPLAINT**

        v.
14
     RYAN PETERSEN,                                       DEMAND FOR JURY TRIAL
15
              Defendant.
16

17          The Securities and Exchange Commission ("Commission") alleges as follows for its

18   complaint against defendant Ryan Petersen ("Petersen"):

19                         <u>**SUMMARY OF ALLEGATIONS**</u>

20          1.      This action concerns an accounting fraud orchestrated by Ryan Petersen at OCZ

21   Technology Group, Inc. ("OCZ"), a now-bankrupt company that sold computer memory storage

22   and power supply devices primarily to distributors, e-tailers, and original equipment

23   manufacturers.

24

SEC v. Petersen
                                                          Complaint

2.      Petersen was OCZ's CEO from the time he founded OCZ in 2002 until he was forced to resign in September 2012. Petersen promoted OCZ to investors as a company that had experienced, and was positioned to experience, significant revenue and gross margin growth. At the time he did so, however, Petersen was engaged in a multi-faceted scheme to materially inflate these metrics. The scheme included (1) mischaracterizing sales discounts as marketing expenses, (2) channel-stuffing OCZ's largest customer to improperly inflate revenues, and (3) concealing customer product returns so that those returns would not be recorded in OCZ's books and records or financial statements.

3.      First, to misclassify sales discounts as marketing expenses, Petersen implemented a program called "customer based programs" or "CBPs," which were purportedly for the purpose of providing funding to customers for short-term marketing programs. Customers received this funding in the form of credits to the customers' accounts. In contrast to a legitimate marketing program, however, Petersen used CBPs as a mechanism to disguise sales discounts, which reduce net revenues, as marketing expenses, which are reported as operating expenses and do not affect revenues. Among other things, Petersen personally negotiated and directed others to negotiate CBP credits that were, in truth, sales discounts. Petersen's scheme caused OCZ to recognize tens of millions of dollars as marketing expenses that should have been recorded as revenue reductions.

4.      Second, Petersen engaged in channel stuffing with OCZ's largest customer – that is, shipping more goods to the customer than it could sell in the normal course of business. Although Petersen was informed that the customer could not pay for the products already in its inventory, he continued to ship products to the customer so that OCZ could increase its reported

SEC v. Petersen
Complaint

revenues.  He also repeatedly provided CBP credits to the customer in order to reduce the price of the OCZ products sitting in its inventory.

5.      Finally, Petersen concealed large product returns – including one for nearly $3.5 million in mid-2012 – from OCZ's finance department and OCZ's auditor.  Petersen instructed employees not to process certain returns and asked that one of the returns be made to "disappear."  He then lied about the returns to members of OCZ's finance department and OCZ's auditor.  As a result of Petersen's actions, the returns were not recorded in OCZ's books and records or its financial statements.

6.      Petersen signed and certified the accuracy of financial statements from the third quarter of fiscal 2011 through the first quarter of fiscal 2013,[1] although he knew, or was reckless in not knowing, that the filings contained materially false or misleading statements.  Petersen also made material misstatements in OCZ's press releases concerning its quarterly and annual financial results from the third quarter of fiscal 2011 through the first quarter of fiscal 2013.

7.      The picture that Petersen portrayed of OCZ's operations and financial condition to investors was a far cry from its true operational and financial condition.  Based largely on this false and misleading information, OCZ raised over $200 million from investors from 2010 through 2012.

8.      Petersen personally profited from his misstatements by, among other things, selling shares of OCZ stock and receiving a bonus during the period when OCZ's financial results were improperly inflated in public filings.

---

[1]      OCZ's fiscal year ended at the end of the month of February.  Accordingly, the third fiscal quarter of 2011 consisted of the three months ending November 30, 2010, and the first fiscal quarter of 2013 consisted of the three months ending May 31, 2012.

SEC v. Petersen
Complaint

9.      By engaging in the conduct described in this Complaint, Petersen violated the anti-fraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; the internal controls and books and records provisions of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rules 13b2-1 [17 C.F.R. § 240.13b2-1]; the lying to accountants provision of Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2]; the certification provision of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; and the clawback provision of Section 304 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") [15 U.S.C. § 7243(a)] and aided and abetted OCZ's violations of the reporting, books and records, and internal controls provisions of Sections 13(a) and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

10.     The Commission seeks an order enjoining Petersen from future violations of the above provisions of the Securities Act and Exchange Act, requiring him to disgorge his ill-gotten gains with prejudgment interest and pay appropriate civil money penalties, requiring him to forfeit any bonus, incentive based compensation or stock sales profits received during the relevant period and imposing upon him an officer and director bar.

SEC v. Petersen
Complaint

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

12.     Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts and omissions constituting violations alleged herein occurred in this judicial district.

13.     <u>Intradistrict Assignment</u>.  Assignment to the San Jose Division is appropriate pursuant to Civil L.R. 3-2(c) and (e) because a substantial part of the events or omissions giving rise to the Commission's claims occurred in the County of Santa Clara.

14.     Petersen, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices, and courses of business described in this Complaint.

## DEFENDANT

15.     **Ryan Petersen**, age 40, founded OCZ and was its CEO from 2002 until he was forced to resign in September 2012.  In 2012, OCZ disclosed in publicly-filed documents that, prior to founding OCZ, Petersen pled guilty or was convicted of crimes for conduct including theft, selling stolen property, and forging a check.  Petersen moved to Panama shortly after his forced resignation from OCZ.  Upon information and belief, Petersen currently resides in Panama.

## RELEVANT ENTITY

16.     **OCZ** was a Delaware corporation formed in 2002 that was headquartered in San Jose, California.  OCZ sold computer memory storage and power supply devices primarily to

SEC v. Petersen
Complaint

distributors, e-tailers, and original equipment manufacturers.  Shares of OCZ's stock traded on the AIM Market of the London Stock Exchange plc from June 2006 through April 2009.  OCZ's common stock was traded on the OTCBB from February 10, 2010 to April 22, 2010, when it began trading on the NASDAQ Capital Market.  OCZ filed for bankruptcy in December 2013.  On February 24, 2014, OCZ's common stock was de-listed from NASDAQ.  On April 16, 2015, the Commission issued an Order Instituting Proceedings, Making Findings, and Revoking Registration of Securities Pursuant to Section 12(j) of the Securities Exchange Act of 1934.  OCZ has liquidated its assets and is no longer operating.

## **FACTS**

### *Background*

17.      Petersen founded OCZ in 2002.  Although the company had engaged in a number of computer-related businesses since its founding, from approximately 2008 through its dissolution, OCZ primarily focused up selling solid state drives ("SSDs"), a new generation of computer storage drives that OCZ promoted as being superior to traditional hard drives.  OCZ sought to capitalize on the expected growth of the SSD market.

18.      Statements made to investors in certain filings with the Commission, which were signed by Petersen, and statements that Petersen made to investors in press releases, which were attached to Commission filings, emphasized OCZ's past, and expected future, revenue growth and gross margin improvements.  OCZ provided guidance concerning revenues and gross margins, and securities analysts focused on these metrics.

19.      Petersen emphasized to OCZ employees the importance of achieving revenue and gross margin targets.  For example, in a May 3, 2012 email, Petersen instructed OCZ's Vice President of Purchasing, "we must find a way to report nasty high [ma]rgins."  A few days later,

SEC v. Petersen
Complaint

1    on May 7, 2012, Petersen asked this executive:  "What other creative margin enhancements can

2    we make[?]"  On May 28, 2012, Petersen wrote to two executives, "If we miss our targets here it

3    will be disastrous."  And on May 30, 2012, the day before quarter-end, Petersen emailed the

4    executives, "If we miss our revenue number you may have misunderstood but they will be

5    replacin[g] management."

6          20.      Petersen's emphasis on OCZ's revenue and gross margin growth in marketing

7    OCZ to investors was successful.  OCZ raised over $200 million from investors from 2010

8    through 2012 through equity offerings.  Much of this capital was raised through registration

9    statements that incorporated false and misleading financial statements.

10         21.      In late 2011, OCZ began negotiating with another technology company about the

11   possible sale of OCZ.  Revenue growth and gross margin improvements were important metrics

12   to the potential acquiring company.  Negotiations temporarily ceased, but started once again in

13   the Spring of 2012.  In June 2012, Petersen emailed OCZ's former CFO, "[i]f we don't have

14   numbers that look reasonable on a high revenue raise and good Gross profit margins for q1 we

15   will be lucky to trade over cash value and I am sure they will withdraw their offer completely."

16         22.      During the time period when Petersen was promoting the company to investors

17   and trying to sell the company by focusing on revenue and gross margin growth, he was engaged

18   in a scheme to materially inflate these metrics, as described further below.

19

20

21

22

23

24

SEC v. Petersen
Complaint

*Mischaracterization of Sales Discounts as Marketing*

23.     In 2010, Petersen instituted a program that he called "customer based programs" or "CBPs," pursuant to which OCZ would purportedly offer short-term marketing programs to its customers.  OCZ would pay for the purported marketing by providing credits to its customers.

24.     Historically, in addition to offering marketing funding to customers, OCZ had provided customers with several types of sales discounts commonly used within the industry, including instant rebates, price protection, and volume incentive rebates.  OCZ properly recorded these sales discounts as reductions to revenue.  CBPs, by contrast, were recorded as marketing expenses in OCZ's books and records and on its financial statements.  Therefore, unlike other sales discounts, OCZ did not reduce its net revenues or gross margins when it issued CBP credits.

25.     Beginning in at least September 2010, Petersen instructed employees to characterize sales discounts provided to customers as CBPs—regardless of whether customers would provide any marketing, whether the value of any marketing provided was equal to the funding given by OCZ, or whether the credits were contingent upon future sales of OCZ products.

26.     Petersen directly negotiated deals with certain customers where sales discounts were classified as CBPs.  For example, in one instant message to a customer, Petersen agreed that the customer could purchase product at an effective price of $52 per solid state drive "after CBP," but requested that the purchase order indicate a price of $60 per drive.  In another instance, Petersen asked a customer about his pricing of three products "after CBP," indicating that the CBP credits had been provided to bring down the price of a product—not for marketing purposes.  Likewise, Petersen emailed a customer offering nearly $277,000 in CBP credits in

SEC v. Petersen
Complaint

connection with a proposed purchase of OCZ products without referencing any marketing that the customer would perform.

27.     Petersen actively concealed the CBP scheme.  Petersen instructed employees to complete marketing approval forms so as to falsely classify sales discounts as CBP credits within OCZ's accounting records.  Petersen also instructed employees to use round-dollar amounts on the forms, which would be indicative of true marketing funding that was the product of independent negotiation and which further would hide the fact that the discount had been calculated on a per-unit basis.  On one occasion, he also instructed an employee to alter the dates on CBP documentation with respect to multiple customers after the documentation had been completed so that the CBP credits would be recorded in later time periods.

28.     In further concealment of the CBP scheme, Petersen reprimanded employees and customers for even mentioning sales discounts.  In December 2010, Petersen emailed one executive, "Be care[ful] with the word IR [instant rebate].  We call those all CBP where possible."  In another instance where a salesperson suggested that OCZ offer a customer an instant rebate, Petersen responded, "why are you emailing around stuff that says IR [instant rebate] in it . . . WTF . . . you can never say that word ever!"  Similarly, in a 2012 email with a customer who referenced price protection, Petersen stated that OCZ does not offer price protection and suggested that the conversation be taken "offline."

29.     CBP funding grew substantially between late 2010 and September 2012.  By mid-2012, virtually all discounts were classified as CBPs and reported as marketing expenses, rather than reductions to revenue.

30.     U.S. generally accepted accounting principles ("GAAP") requires vendors, such as OCZ, to record sales discounts as reductions to revenue.  Doing so, in turn, reduces gross

SEC v. Petersen
Complaint

1   profits.  Specifically, where the vendor provides consideration, such as a marketing credit, to a

2   customer, the vendor must reduce revenue by the amount of that consideration unless two criteria

3   are met:  (1) the vendor receives an identifiable benefit for consideration that could have been

4   obtained from a party other than the purchaser of the product; and (2) the vendor can reasonably

5   estimate the fair value of the benefit.  *See* Accounting Standards Codification ("ASC") 605-50-

6   45.  Petersen understood, or was reckless in not understanding, these requirements before he

7   instituted and executed the CBP scheme.

8           31.     Petersen also understood, or was reckless in not understanding, the effect that

9   misclassifying discounts as marketing expenses had on OCZ's financial statements.  He received

10  numerous analyses indicating that sales discounts affected OCZ's revenues and gross profits,

11  whereas CBP expenses were recorded "below the line"—*i.e.*, did not affect revenues or gross

12  profits.

13          32.     Petersen's scheme to mischaracterize sales discounts as marketing expenses

14  resulted in OCZ reporting materially inflated revenues and gross profits in its periodic reports

15  from the quarter ending November 30, 2010 through the quarter ending May 31, 2012.

16  ***Channel Stuffing OCZ's Largest Customer***

17          33.     OCZ's largest customer in 2012 and the first quarter of 2013 was a German

18  distributor ("German Distributor").  German Distributor accounted for approximately 10% of

19  OCZ's sales in 2012 and approximately 17% of OCZ's sales in the first quarter of 2013.

20  Petersen personally conducted OCZ's negotiations with German Distributor.

21          34.     Petersen's negotiations resulted in shipments of OCZ product to German

22  Distributor in advance of any commercially reasonable demand for those products, *i.e.*, channel-

23  stuffing.  OCZ's recognition of revenues for most of these shipments was improper under GAAP

24

SEC v. Petersen
Complaint

and was inconsistent with OCZ's own revenue recognition policy set forth in its annual reports, which Petersen signed and certified.

35.     Under GAAP, revenue must be realized or realizable and earned before it can be recognized.  Consistent with these requirements, OCZ's revenue recognition policy provided, among other things, that it recognized revenue when, among other things, (1) the terms are fixed, and (2) collection is probable.

36.     Petersen knew that OCZ's prices were not fixed for products sold to German Distributor.  Petersen repeatedly promised German Distributor that he would offer German Distributor discounts characterized as CBPs to reduce German Distributor's carrying cost for OCZ products.  Petersen provided German Distributor with millions of dollars in discounts mischaracterized as CBP funding to bring down German Distributor's costs on an ongoing basis. Petersen instructed an employee to provide false information to an OCZ accountant about the amount of CBP credits that he had promised to German Distributor.

37.     Petersen also knew that collectability was not probable for products sold to German Distributor.  German Distributor's owner indicated in multiple emails to Petersen that it could not pay for the OCZ inventory that it had in stock.  As early as October 2011, German Distributor's owner sent Petersen an email with the subject line "PROBLEMS," noting that he and Petersen had agreed to "payment after sellout."  Petersen responded that German Distributor should blow out the product below cost and he would make it up to German Distributor later.  In December 2011, German Distributor's owner emailed that he had "Stock Problems" and requested that Petersen help him out.  The warnings about German Distributor's inventory levels grew increasingly dire over time.  In late May 2012, German Distributor's owner emailed Petersen that he had "too many OCZ in Stock…I need your help" and sent a separate email

SEC v. Petersen
Complaint

1   approximately one week later stating, "I am dead---too many OCZ stock."  In June 2012,

2   German Distributor's owner emailed Petersen, "I am in fear…seriously."

3       38.    As German Distributor's outstanding balance grew, Petersen forbade others at

4   OCZ from dealing directly with German Distributor and lied about the reasons for German

5   Distributor's growing balance.

6       39.    The repeated CBP credits issued to German Distributor and the stated concerns of

7   German Distributor's owner about the distributor's ability to pay for OCZ's products should

8   have precluded revenue recognition for purported sales to German Distributor.  Petersen knew or

9   was reckless in not knowing that sales to German Distributor failed to comply with GAAP or

10   OCZ's revenue recognition criteria.

11       40.    As a result of OCZ's channel stuffing, which was directed by Petersen, OCZ

12   reported materially inflated revenues and gross profits in its periodic reports from the quarter

13   ending February 29, 2012 through the quarter ending May 31, 2012.

14   ***Concealing Product Returns***

15       41.    Petersen also directed OCZ employees not to process or record a number of

16   significant product returns from customers.

17       42.    In one instance, a Chinese distributor ("Chinese Distributor") returned

18   approximately $1 million of product to OCZ's Taiwan warehouse in late December 2011, after

19   Petersen failed in his efforts to convince Chinese Distributor not to return the product.  Petersen

20   subsequently took steps to hide the return from OCZ's finance department and its auditor.

21       43.    Petersen first instructed an employee that the return should not be processed.

22   Petersen received an email confirming that his instruction had been followed.  Then, after several

23   months of hiding the return, *i.e.*, failing to record the product as inventory in OCZ's records,

24

SEC v. Petersen
Complaint

1    Petersen told employees to make the returned product disappear.  At around the time he gave that

2    instruction, Petersen informed an employee that if OCZ recorded the return, it would have to

3    restate prior financials.  Petersen's instructions were carried out:  a truck driver in Taiwan picked

4    up the products on or about May 24, 2012 without paying for the product.  At the time, OCZ

5    failed to reduce its revenues or to increase its inventory for the amount of the product return.

6          44.     Separately, during the third quarter of fiscal 2012, a large distributor made one of

7    the largest purchases in OCZ's history.  The distributor, however, had difficulty selling the

8    products it purchased.  In late May 2012, Petersen agreed to accept a return of nearly $3.5

9    million worth of product in exchange for the distributor's agreement to purchase a similar

10   amount of product before the end of the first quarter of fiscal 2013.

11         45.     Petersen requested that the distributor wait to return the product until sometime in

12   June 2012—in other words, after the end of the quarter on May 31, 2012.  Petersen subsequently

13   authorized an employee to issue a document memorializing the authorization of the return to be

14   sent to the customer.  When the distributor attempted to return the goods in approximately late

15   June 2012, however, Petersen told OCZ's finance department that he had rejected the return.

16   The goods were stored in a warehouse controlled by the freight company that had attempted to

17   deliver the goods.

18         46.     As a result of Petersen's conduct, OCZ did not record the return of the goods in

19   its accounting records or its financial statements.

20         47.     After holding the returns for approximately one to two months at the warehouse,

21   OCZ ultimately took the goods back after others at OCZ learned about the issue.

22

23

24

SEC v. Petersen
                    Complaint

48.    In addition to the returns described above, OCZ received several additional significant customer returns in approximately late May/early June 2012.  Petersen directed employees not to process the returns—which totaled over $575,000.

49.    Petersen's instructions not to process the returns in May and June 2012 coincided with the ramp-up of negotiations and due diligence in connection with a potential merger/buyout.

50.    As a result of Petersen's scheme not to record the product returns, OCZ reported materially inflated revenues and gross profits in the fourth quarter of 2012 and the first quarter of 2013.

***Petersen's Scheme Comes To Light***

51.    On September 5, 2012, OCZ announced that it would miss its revenue guidance for the second quarter of fiscal 2013.  On September 17, 2012, OCZ announced Petersen's resignation as CEO and a director of the company.  Subsequently, on October 10, 2012, OCZ announced that it would delay the filing of its Form 10-Q for the second quarter of fiscal 2013 and was reducing its revenue expectations for the quarter, primarily based on the revenue impact of "customer incentive programs . . . which the Company will be reporting as a material weakness."  OCZ's stock price plummeted following the September 5 and October 10 announcements.

SEC v. Petersen
Complaint

52.     In October 2013, OCZ issued a restatement of its financial statements.  As reflected in the below table, in the period from the third quarter of 2011 through the first quarter of 2013, OCZ reduced revenues by nearly $99 million, reducing revenues by more than 48% in the quarter ending May 31, 2012:

| | Net Revenues (000s) | | | |
|---|---|---|---|---|
| | | | | |
| Quarter Ending | As Filed | Change | Restatement | % Overstated |
| 11/30/2010 | 53,222 | (622) | 52,600 | 1.2% |
| 2/28/2011 | 64,566 | (5,586) | 58,980 | 9.5% |
| 5/31/2011 | 73,794 | (9,826) | 63,968 | 15.4% |
| 8/31/2011 | 78,454 | (2,058) | 76,396 | 2.7% |
| 11/30/2011 | 103,084 | (15,424) | 87,660 | 17.6% |
| 2/29/2012 | 110,442 | (28,306) | 82,136 | 34.5% |
| 5/31/2012 | 113,620 | (37,128) | 76,492 | 48.5% |
| | | | | |
| Totals | 597,182 | (98,950) | 498,232 | 19.9% |

53.     OCZ's reduction of its gross profits as part of the restatement was even more dramatic, reducing gross profits by over $116 million from the third quarter of 2011 through the first quarter of 2013 as summarized in the following table:

| | Gross Profit (000s) | | |
|---|---|---|---|
| | | | |
| Quarter Ending | As Filed | Change | Restatement |
| 11/30/2010 | 7,661 | (4,310) | 3,351 |
| 2/28/2011 | 10,709 | (4,940) | 5,769 |
| 5/31/2011 | 14,744 | (9,135) | 5,609 |
| 8/31/2011 | 16,931 | (10,104) | 6,827 |
| 11/30/2011 | 23,175 | (22,164) | 1,011 |
| 2/29/2012 | 27,586 | (28,823) | (1,237) |
| 5/31/2012 | 28,431 | (36,836) | (8,405) |
| | | | |
| Totals | 129,237 | (116,312) | 12,925 |

54.     Less than two months after filing the restatement, OCZ filed for bankruptcy protection.  It has since liquidated all of its assets and is no longer operating.

SEC v. Petersen
Complaint

*Misrepresentations in Commission Filings And To OCZ's Auditor*

55.     Petersen's actions, as described above, resulted in material misrepresentations in the following OCZ filings with the Commission:

> a.   OCZ's annual reports on Form 10-K for the years 2011 and 2012, each of which was signed and certified by Petersen;
>
> b.   OCZ's quarterly reports on Form 10-Q for the periods ending November 30, 2010, May 31, 2011, August 31, 2011, November 30, 2011 and May 31, 2012, each of which was signed and certified by Petersen;
>
> c.   OCZ's current reports on Form 8-K, filed on July 10, 2012, May 1, 2012, January 9, 2012, October 5, 2011, July 6, 2011, May 3, 2011, and January 10, 2011.
>
> d.   OCZ's Form S-8 dated December 22, 2010, which was signed by Petersen, and incorporated by reference one or more of the misstated financial statements;
>
> e.   OCZ's Form S-8 dated October 14, 2011, which was signed by Petersen, and incorporated by reference one or more of the misstated financial statements;
>
> f.   OCZ's Form S-3 dated December 1, 2011, which was signed by Petersen, and incorporated by reference one or more of the misstated financial statements.

56.     Petersen also falsely certified, in OCZ's quarterly reports for the period ending November 30, 2010 through the period ending May 31, 2012 and in OCZ's annual reports for 2011 and 2012, that he reviewed each of the reports and that, among other things, (i) to the best of his knowledge the financial statements did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

SEC v. Petersen
Complaint

circumstances under which such statements were made, not misleading with respect to the period covered by the reports; (ii) to the best of his knowledge the financial statements, and other financial information included in the reports, fairly presented in all material respects the financial condition, results of operations and cash flows of OCZ for the periods presented in the reports; and (iii) he had designed internal control over financial reporting, or caused such internal control over financial reporting to be designed, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

57.     In management representation letters sent to OCZ's auditor in connection with the periodic reports from the period ending November 30, 2010 through the period ending May 31, 2012, and in management representation letters concerning certain registration statements during the period, Petersen falsely represented, among other things, that (i) he believed the financial statements conformed with GAAP; (ii) all financial and related data had been made available to the auditor; and (iii) he had no knowledge of fraud or suspected fraud involving management.

## FIRST CLAIM FOR RELIEF

**Fraud: Section 10(b) of the Exchange Act and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

58.     Paragraphs 1 through 57 are realleged and incorporated by reference herein.

59.     Petersen, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

a.   employed devices, schemes, or artifices to defraud;

SEC v. Petersen
Complaint

b.  made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

60.  By engaging in the conduct described above, Petersen violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## SECOND CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities: Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**

61.  Paragraphs 1 through 57 are realleged and incorporated by reference herein.

62.  Petersen, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:

a.  knowingly or recklessly employed devices, schemes, or artifices to defraud;

b.  knowingly, recklessly or negligently obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.  knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

SEC v. Petersen
Complaint

63.     By engaging in the conduct described above, Petersen violated, and unless restrained and enjoined will again violate, Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2), and (3)].

## THIRD CLAIM FOR RELIEF

### Knowingly Falsifying Books, Records, or Accounts: Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]

64.     Paragraphs 1 through 57 are realleged and incorporated by reference herein.

65.     Petersen, by engaging in the conduct described above, knowingly circumvented or knowingly failed to implement a system of internal accounting controls.

66.     By engaging in the conduct described above, Petersen violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## FOURTH CLAIM FOR RELIEF

### Falsified Books, Records, or Accounts: Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1]

67.     Paragraphs 1 through 57 are realleged and incorporated by reference herein.

68.     Petersen, by engaging in the conduct described above, directly or indirectly, falsified or caused to be falsified OCZ's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

69.     By engaging in the conduct described above, Petersen violated, and unless restrained and enjoined, will in the future violate Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

SEC v. Petersen
Complaint

**FIFTH CLAIM FOR RELIEF**

**Lying to Accountants: Rule 13b2-2 of the Exchange Act
[17 C.F.R. § 240.13b2-2]**

70.     Paragraphs 1 through 57 are realleged and incorporated by reference herein.

71.     Petersen, by engaging in the conduct described above, directly or indirectly: (a) made or caused to be made materially false or misleading statements to accountants; or (b) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to accountants in connection with: (1) an audit, review or examination of the financial statements of the issuer required to be made; or (2) the preparation or filing of a document or report required to be filed with the SEC.

72.     By engaging in the conduct described above, Petersen violated, and unless restrained and enjoined will again violate, Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

**SIXTH CLAIM FOR RELIEF**

**False Certifications: Rule 13a-14 of the Exchange Act
[17 C.F.R. § 240.13a-14]**

73.     Paragraphs 1 through 57 are realleged and incorporated by reference herein.

74.     Petersen falsely certified in OCZ's Forms 10-Q for the periods ended November 30, 2010, May 31, August 31 and November 30, 2011 and May 31, 2012 and Forms 10-K for the periods ended February 28, 2011 and February 29, 2012 that, among other things, he reviewed each of the reports and that (i) to the best of his knowledge the financial statements did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the reports; (ii) to the best of his knowledge the

SEC v. Petersen
                Complaint

1  financial statements, and other financial information included in the reports, fairly presented in

2  all material respects the financial condition, results of operations and cash flows of OCZ for the

3  periods presented in the reports; and (iii) he had designed internal control over financial

4  reporting, or caused such internal control over financial reporting to be designed, to provide

5  reasonable assurance regarding the reliability of financial reporting and the preparation of

6  financial statements for external purposes in accordance with generally accepted accounting

7  principles.

8      75.    By engaging in the conduct described above, Petersen violated and unless

9  restrained and enjoined will in the future violate Rule 13a-14 of the Exchange Act [17 C.F.R. §

10  240.13a-14].

11                          **SEVENTH CLAIM FOR RELIEF**

12  **Reporting Violations: Aiding and Abetting OCZ's Violations of Section 13(a) and Rules
    12b-20, 13a-1. 13a-11 and 13a-13 of the Exchange Act**

13  **[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]**

14      76.    Paragraphs 1 through 57 are realleged and incorporated by reference herein.

15      77.    OCZ violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and

16  Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and

17  240.13a-13], by filing with the Commission materially false and misleading periodic reports,

18  including annual and quarterly reports on Forms 10-K and 10-Q from the period ending

19  November 30, 2010 through the period ending May 31, 2012.  OCZ also violated Rule 13a-11 of

20  the Exchange Act [17 C.F.R. § 240.13a-11], by filing with the Commission false and misleading

21  current reports on Forms 8-K reporting false and misleading financial results for the periods

22  ending August 31, 2010 through May 31, 2012.

23      78.    Petersen, by engaging in the conduct described above, knowingly or recklessly

24  provided substantial assistance to OCZ's violation of Section 13(a) of the Exchange Act [15

SEC v. Petersen
Complaint

1   U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§

2   240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

3           79.     By engaging in the conduct described above, and pursuant to Section 20(e) of the

4   Exchange Act [15 U.S.C. § 78t(e)], Petersen aided and abetted OCZ's violations, and unless

5   restrained and enjoined will in the future aid and abet violations, of Section 13(a) of the

6   Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder

7   [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

8                              **EIGHTH CLAIM FOR RELIEF**

9      **Internal Controls / Recordkeeping: Aiding and Abetting OCZ's Violations of Section**
                       **13(b)(2)(A) and (B) of the Exchange Act**

10                      **[15 U.S.C. §§ 78m(b)(2)(A) and (B)]**

11          80.     Paragraphs 1 through 57 are realleged and incorporated by reference herein.

12          81.     OCZ violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §

13  78m(b)(2)(A)], by failing to make or keep books, records and accounts that in reasonable detail

14  accurately and fairly reflected its transactions and disposition of its assets.  OCZ violated Section

15  13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], by failing to devise and maintain a

16  system of internal accounting controls sufficient to provide reasonable assurances that

17  transactions were recorded as necessary to permit preparation of financial statements in

18  conformity with GAAP and to maintain accountability of assets.

19          82.     Petersen, by engaging in the conduct described above, knowingly or recklessly

20  provided substantial assistance to OCZ's violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the

21  Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

22          83.     By engaging in the conduct described above and pursuant to Section 20(e) of the

23  Exchange Act [15 U.S.C. § 78t(e)], Petersen aided and abetted OCZ's violations, and unless

24

1  enjoined will in the future aid and abet violations, of Sections 13(b)(2)(A) and 13(b)(2)(B) of the

2  Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

3  ### NINTH CLAIM FOR RELIEF

4  **Failure to Reimburse: Section 304 of the Sarbanes-Oxley Act
   [15 U.S.C. § 7243(a)]**

5  84.     Paragraphs 1 through 57 are realleged and incorporated by reference herein.

6  85.     Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)] requires the CEO

7  of an issuer that is required to prepare an accounting restatement due to the material

8  noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement

9  under the securities laws, to reimburse the issuer for any bonus or other incentive-based or

10  equity-based compensation they received during the 12-month period following the first public

11  issuance or filing of the financial document embodying such financial reporting requirement and

12  any profits realized from the sale of the issuer's stock during the 12-month period.

13  86.     OCZ was required to prepare an accounting restatement as a result of misconduct.

14  87.     Petersen has not reimbursed OCZ for the profits realized from the sale of OCZ's

15  stock and the bonus that he received or obtained during the statutory time periods established by

16  section 304(a) of Sarbanes-Oxley [15 U.S.C. § 7243(a)].

17  88.     The Commission has not exempted Petersen, pursuant to Section 304(b) of the

18  Sarbanes-Oxley Act [15 U.S.C. § 7243(b)], from the application of Section 304(a) of the

19  Sarbanes-Oxley Act [15 U.S.C. § 7243(a)].

20  89.     By reason of the foregoing, Petersen has not complied with Section 304(a) of

21  Sarbanes-Oxley [15 U.S.C. § 7243(a)].

22

23

24

SEC v. Petersen
                         Complaint

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

A.     Permanently enjoin Petersen from (i) violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange Act Rules Rule 10b-5, 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; and (ii) aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (B)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13];

B.     Order that Petersen disgorge his ill-gotten gains obtained as a result of the violations alleged in this Complaint, with prejudgment interest;

C.     Order that Petersen pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court, plus post-judgment interest;

D.     Order that Petersen, pursuant to Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)], pay the amount of any bonus and other incentive-based or equity-based compensation he received from OCZ and profits he realized from the sale of OCZ stock during the relevant statutory time period;

E.     Order that Petersen is barred from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)]; and

F.     Grant such further relief as the Court may deem just and appropriate.

SEC v. Petersen
Complaint

1

## REQUEST FOR JURY TRIAL

2

The Commission hereby demands a jury trial.

3

Date:   October 6, 2015                            /s/ Kevin Lombardi

4                                                         Kevin Lombardi, Trial Attorney
                                                        District of Columbia Bar No. 474114

5                                                         Division of Enforcement
                                                        Securities and Exchange Commission

6                                                         100 F Street, N.E.
                                                        Washington, D.C. 20549

7                                                         Tel:  (202) 551-8753
                                                        Fax: (202) 772-9291

8                                                         Email: lombardik@sec.gov

9   Of Counsel:
    Lisa Weinstein Deitch

10  California Bar No. 137492
    Ian R. Dattner

11  New York Bar No. 4411187
    Division of Enforcement

12  Securities and Exchange Commission

13

14

15

16

17

18

19

20

21

22

23

24